UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA HILTON, | ) | Case No.  5:07CV186 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, | ) | MEMORANDUM ORDER AND OPINION |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

Samantha Hilton ("Plaintiff"), seeks judicial review of the final decision of Michael J. Astrue

("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

ECF Dkt. #1.  Plaintiff asserts that: (1) the Administrative Law Judge ("ALJ") lacked substantial

evidence with which to find that her impairments did not equal 20 C.F.R. Part 404, Subpart P,

Appendix 1, Listing 1.04A from January 2006 forward; (2) the ALJ erred in proceeding with the

hearing in her absence; and (3) the ALJ erred in rejecting the medical opinions of Drs. Withnell, Dunn

and Quinn.  ECF Dkt. #11.   For the following reasons, the Court AFFIRMS the ALJ's decision.

I.      **PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on June 30, 2004, alleging disability beginning

March 2, 2004, due to degenerative disc disease and affective disorders.  Tr. at 63, 86, 397-399.  The

SSA denied Plaintiff's applications initially and on reconsideration.  *Id.* at 61-69.  Plaintiff requested

1

a hearing before an ALJ which was held on August 17, 2006. *Id.* at 413. Plaintiff's counsel attended the hearing, but Plaintiff did not appear. *Id.* A medical and vocational expert also testified. *Id.*

On September 21, 2006, the ALJ denied Plaintiff's applications for DIB and SSI, finding that while her impairments of chronic low back pain due to degenerative disc disease, personality disorder not otherwise specified manifesting with despondent and histrionic traits, and major depressive disorder were severe, they did not, individually or in combination, meet or equal the requirements of a listed impairment. Tr. at 25. The ALJ further found that Plaintiff could perform a range of light work requiring: lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently; sitting, standing and/or walking six hours of an eight-hour workday; simple instructions and routine repetitive tasks; occasional face-to-face interaction with co-workers and supervisors; and work not requiring ladder or rope climbing, unprotected heights or hazards; or wet, slippery or uneven surfaces. *Id.* at 27. The ALJ concluded that Plaintiff could return to her past relevant work as a switchboard operator based upon the residual functional capacity ("RFC") that she found. *Id.* at 30.

Plaintiff requested that the Appeals Council review the ALJ's decision and her counsel provided written arguments. Tr. at 7-19. The Appeals Council denied this request, finding that the arguments did not provide a basis for changing the ALJ's decision. *Id.* at 6.

Plaintiff filed a timely appeal to this Court on January 23, 2007, and Defendant answered. ECF Dkt. #1, 9. Both parties have filed briefs addressing the merits of the case. ECF Dkt. #s 11, 15. At issue is the decision of the ALJ dated September 21, 2006, which stands as the final decision. Tr. at 23-31; 20 C.F.R. § 404.984.

## II.   SUMMARY OF MEDICAL EVIDENCE

The relevant medical evidence shows that on May 29, 2004, Plaintiff presented to the

emergency room for recent flare-up of her longstanding history of low back pain. Tr. at 149. Dr. Zets noted that Plaintiff had no precipitating injury and the pain radiated to her right leg. *Id.* Upon examination, he found that she had spasm in her L4-L5 region and he diagnosed her with lumbar radiculopathy. *Id.* Dr. Zets treated her with Demerol and Phenergan and noted that she had significant improvement. *Id.* He placed Plaintiff on Percocet and Prednisone and told her to follow up with the pain clinic in one week. *Id.*

On June 3, 2004, Plaintiff presented to Dr. Withnell, her treating physician, for follow-up from her emergency room visit. Tr. at 195. Plaintiff reported that the Percocet was helping. *Id.* Upon examination, Dr. Withnell found that Plaintiff walked with an antalgic gait, leaning to the right side. *Id.* Plaintiff had trouble lifting her right leg, but upon walking, her gait was normal. *Id.* Dr. Withnell found diffuse paraspinal muscular tenderness over the lower thoracic and lumbosacral area, point tenderness over the right SI joint, and right sciatica. *Id.* She had intact sensation and normal curvature, but limited range of motion. *Id.* Dr. Withnell diagnosed low back pain with possible radicular symptoms and he continued Plaintiff on Percocet. *Id.* He also prescribed Naprosyn and Valium and scheduled her for an MRI. *Id.*

On June 22, 2004, Plaintiff underwent an MRI of her spine for lumbar pain with radiculitis. Tr. at 193. The MRI revealed that Plaintiff had central disc herniation and annular tear involving L4-L5, with no nerve root encroachment. *Id.* A mild central disc bulge was also noted at L5-S1. *Id.*

On June 29, 2004, Dr. Withnell examined Plaintiff for her back pain. Tr. at 194. Plaintiff reported that she had significant relief from muscle spasms from the Valium, although she still had ongoing pain. *Id.* She noted that the Valium made her feel a little "loopy", but she felt like she could function better because she did not concentrate on her back pain. *Id.* Dr. Withnell noted that Plaintiff was seeing a chiropractor, Dr. Worst, and had been to the pain management clinic. *Id.* He indicated

that Plaintiff left him with the impression that she was not going back to the clinic because she felt that they did not help her, but the clinic called and told him that Plaintiff was going to fill the Flexeril prescription from the clinic, in addition to the Vicodin and Valium prescriptions that he had prescribed. *Id.* Dr. Withnell indicated that Plaintiff's back was still a little tight, but not tense or tender as it was on the last examination. *Id.* He also found that Plaintiff had a better range of motion and a normal gait. *Id.* He decided to refer her to Dr. Cecil, an orthopedic surgeon. *Id.*

On September 9, 2004, Dr. Worst, Plaintiff's chiropractor, completed an agency questionnaire stating that he first saw Plaintiff on April 14, 2004 and last saw her on May 30, 2004. Tr. at 153. He noted that Plaintiff presented to him with a forward and/or left antalgia and a June 22, 2004 MRI showed a disc herniation at L4-L5. *Id.* He stated that Plaintiff's low back pain affected both lower extremities, although more on the right, and she suffered from muscle spasms. *Id.* at 154. He indicated that Plaintiff's ability to perform fine and gross manipulations depended upon the task and her degree of pain at the time. *Id.* Dr. Worst stated that Plaintiff had been compliant with treatment, but her progress was limited. *Id.* He also indicated that Plaintiff's ability to use her extremities for functional tasks depended upon her activity level and her present degree of tolerance. *Id.*

On September 10, 2004, Ryan Dunn, Ph.D., evaluated Plaintiff at the request of the agency. Tr. at 155. Plaintiff told Dr. Dunn that she was single, lived with her two daughters, and had only sporadic employment throughout her adult life. *Id.* She reported that she had sought disability benefits ten years ago, but she was denied. *Id.* She was currently applying for benefits due to re-escalating back pain and depression. *Id.*

Plaintiff informed Dr. Dunn that she suffered from depression for the last five years. Tr. at 155. She indicated that she did not like to be alone and kept her three year-old and six year-old daughters up until 2:00 a.m or 3:00 a.m. because she did not want to be alone. *Id.* Plaintiff stated that

-4-

she does housework and cooks regularly, but she avoids others and does not go out unless it is necessary.  *Id*.  She had been on Zoloft and Wellbutrin, and she had been taking Lexapro for the last six weeks, but did not notice any difference in her symptoms.  *Id*. at 155-156.  She began therapy and been to a counselor twice, but canceled her third appointment because she and her daughter stayed up late and she let her daughter stay home from school because she was tired.  *Id*. at 156.

Plaintiff further indicated that she had a history of poor relationships, as the father of her daughters was physically abusive and placed in jail.  Tr. at 156.  He recent ex-fiancee continued to harass her and had broken into her apartment.  *Id*.  She reported that she continued to have contact with him, asking him for money, and sleeping with him at his insistence for his help.  *Id*.  Dr. Dunn indicated that Plaintiff's reports were dramatic, she spoke rapidly with excessive detail, and she required frequent redirection.  *Id*.

Plaintiff reported that her primary medical condition was chronic back pain from falling down steps at 17 years old.  Tr. at 157.  She indicated that she was currently being assessed for surgery.  *Id*.  She estimated that she could stand for 15-20 minutes, walk for 60-90 minutes before resting, and sit for 20-30 minutes before changing positions or lying down.  *Id.*  She also described asthma and stomach problems.  *Id*.  Dr. Dunn stated that Plaintiff's reports were clearly exaggerated, such as when she described the maximum amount that she could lift as "None!" but then admitted that she could lift her thirty-two pound daughter with pain.  *Id.* at 156.

Plaintiff described her past employment as an emergency room clerk, a receptionist at a nursing home, a waitress, and a switchboard operator.  Tr. at157.  She was fired from the clerk job due to absenteeism and disrespect, but stated that her doctor put her on medical leave which caused the absences.  *Id*.  The longest position that she held was the switchboard operator job, which was for eighteen months.  *Id*.  She stated that absenteeism in all of her jobs was because of back pain.  *Id*.

Dr. Dunn described Plaintiff's flow of conversation and thought as clear, with a rapid rate of speech, logical and coherent thought processes and direct answers. Tr. at 157. Her mood was anxious and her affect was labile and appropriate, although she appeared agitated. *Id*. Plaintiff was alert and oriented, with average cognitive functioning, but below normal attention and concentration. *Id.* at 158. Dr. Dunn found Plaintiff's insight and judgment to be sufficient to accomplish basic life tasks and found that she was sufficiently motivated to seek mental health treatment. *Id*.

Dr. Dunn diagnosed Plaintiff with chronic moderate major depression, and personality disorder not otherwise specified, manifesting with dependent and histrionic traits. Tr. at 159. He assigned her a global assessment of functioning ("GAF") score of 52, a functional GAF of 49 and an overall GAF of 49, which indicated serious symptoms. *Id*. He concluded that: Plaintiff's mental ability to relate to others was moderately impaired; her ability to understand, remember and follow instructions was not significantly limited; her mental ability to maintain concentration, attention, persistence and pace showed possible mild limitations; her mental ability to withstand stress and pressures of daily work showed moderate to marked limitations; and her mental ability to manage funds was not limited. *Id.*    On July 16, 2004, Dr. Withnell met with Plaintiff because she needed a letter stating that she was "temporarily, permanently disabled" due to her low back pain. Tr. at 191. Dr. Withnell indicated that he would fax such a letter and he noted that Plaintiff was scheduled to see Dr. Cecil, an orthopedic surgeon, in December. *Id*. Plaintiff also complained of depression. *Id*. Dr. Withnell diagnosed low back pain secondary to herniated disc, continued her Valium, discontinued the Percocet, and prescribed Vicodin extra strength four times per day as needed. *Id.* at 192. He also diagnosed major depression and insomnia and prescribed medications. *Id*.

On August 3, 2004, Dr. Withnell examined Plaintiff for her complaints of depression.  Tr. at 188.  Plaintiff reported that she was feeling a little better on the Lexapro.  *Id*.  She stated that she felt drowsy, but did not know if that was due to the medication, her depression, or her back pain which disrupted her sleep.  *Id.*  Dr. Withnell examined Plaintiff's back and noted less tenderness over the right lumbosacral paraspinal musculature.  *Id*.  He diagnosed low back pain secondary to probable disc disease and continued her medications.  *Id.*

On September 3, 2004, Dr. Withnell saw Plaintiff and noted that she was mainly there for a counseling appointment.  Tr. at 185.  He indicated that Plaintiff was having stress due to her ex-fiancee and she reported that her back continued to be a problem; however, she now had a St. Bernard and that she exacerbated her back pain while she was trying to train the dog.  *Id.* Dr. Withnell continued Plaintiff's Endocet/Darvocet and Lexapro and indicated that his office would try to get her an appointment earlier than her scheduled December appointment with Dr. Cecil.  *Id.*

On September 14, 2004, Plaintiff presented to Dr. Withnell for a chest cold and ongoing low-back pain.  Tr. at184.  Dr. Withnell noted that Plaintiff was caring for her two children and now had a German Shepard which had been pulling at her.  *Id*.  He diagnosed her with sinusitis and chronic low-back pain.  *Id*.  He continued her Edocet and dictated a letter to Dr. Cecil, asking if he could see her before her scheduled December appointment.  *Id.*

On November 14, 2004, Dr. Rath, an agency reviewing physician, completed a physical RFC assessment of Plaintiff's conditions of lumbosacral disc disease and depression based upon the medical evidence in Plaintiff's file.  Tr. at 202-209.  Dr. Rath opined that Plaintiff could:  lift ten pounds frequently and twenty pounds occasionally; stand, walk and/or sit about six hours of an eight-hour workday; and push and pull without limits.  *Id.* at 203-204.  However, the doctor noted that

Plaintiff was likely to have a laminectomy in the near future and her capacity for physical exertion would be limited. *Id.* The doctor further opined that Plaintiff could occasionally perform postural limitations such as stooping and crawling, and she could frequently kneel and crouch, but she could never climb ladders, ropes or scaffolds. *Id.* at 204. He also indicated that Plaintiff should avoid concentrated exposure to vibration and should avoid even moderate exposure to hazards, such as unprotected heights. *Id*. at 206. Dr. Villanueva affirmed these findings on July 2, 2005. *Id*. at 209.

On November 21, 2004, Plaintiff presented to the emergency room due to depression. Tr. at 366. Plaintiff was given Zoloft and an appointment with her doctor. *Id.*

On December 10, 2004, Plaintiff underwent an MRI of the lumbar spine which revealed disc degeneration at L4-5 and L5-S1 with diffuse disc bulging pattern and additional posterior midline disc protrusions causing focal extrinsic impression upon the thecal sac margins at those levels in the midline without distinct nerve root contact. Additional indicators of fissuring of the posterior margin of the annulus at L5-S1 were noted in the midline. Tr. at 230-231.

On December 13, 2004, Dr. Cecil examined Plaintiff. Tr. at 309. Based upon his examination and Plaintiff's 2002 MRI scan, Dr. Cecil diagnosed Plaintiff with chronic low back pain and degenerative disc disease with discogenic low back pain. *Id*. He noted that surgical intervention was rarely warranted in younger patients. *Id.*

On January 4, 2005, a doctor whose name appears to be Dr. Meyer, completed a mental RFC assessment and psychiatric review technique form for the agency upon review of Plaintiff's file. Tr. at 253-255. He found that Plaintiff was not significantly limited in the areas of: remembering locations and work procedures; understanding, remembering and executing very short and simple instructions; maintaining attention and concentration for extended periods; sustaining an ordinary

-8-

routine without special supervision; working with others without being distracted by them; making simple work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places.  *Id.*  He further found that Plaintiff was moderately limited in: understanding, remembering, and executing detailed instructions; performing activities within a schedule; maintaining regular attendance and being punctual; completing a normal workday and workweek without interruptions from physically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instruction and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and setting realistic goals or making plans independently of others.  *Id.*

Dr. Meyer further found that Plaintiff's mental conditions were reviewable under Listing 12.04 for affective disorders and 12.08 for personality disorders.  Tr. at 260, 264.  As to Listing 12.04, Dr. Meyer found that the records showed that Plaintiff's conditions met a depressive syndrome as she had a disturbance of mood accompanied by a depressive syndrome characterized by sleep disturbance, psychomotor agitation, decreased energy, and feelings of guilt or worthlessness.  *Id.* at 260.  Dr. Meyer also found that the evidence showed that Plaintiff's mental conditions met a condition under Listing Listing 12.08.  *Id.* at 264.  However, Dr. Meyer found that Plaintiff's conditions only moderately restricted her daily living activities, her abilities to maintain social functioning, and her abilities to maintain concentration, persistence and pace.  *Id.* at 267.

On March 8, 2005, Dr. Cecil completed an agency questionnaire relating to Plaintiff's physical RFC. Tr. at 298-302. He indicated that he first treated Plaintiff on December 13, 2004 for degenerative disc disease of the lumbar spine which caused low back pain with activity. *Id.* at 298. He stated that she had a limited range of motion when hyperextending her back and she had tenderness in her back. *Id.* at 300. He concluded that her prognosis was excellent, but stated that he had only treated her with a single preliminary evaluation. *Id.* When asked to estimate Plaintiff's level of pain, he indicated that subjectively, Plaintiff stated that it was severe. *Id.* He concluded that Plaintiff could sit up to six hours per eight-hour workday and she could stand/walk up to three hours. *Id.* at 299. He further estimated that Plaintiff could occasionally lift and carry up to ten pounds and could never lift more than that. *Id.* He also indicated that Plaintiff had no significant limitations in repetitive reaching, handling, fingering or lifting, except for lifting more than ten pounds over one-third of an eight-hour day. *Id.* As to other limitations, Dr. Cecil opined that Plaintiff should avoid repetitive stooping, repetitive bending for more than one-third of an eight-hour day, and she could push and pull up to twenty pounds only. *Id.* at 300. Dr. Cecil concluded that Plaintiff was capable of tolerating moderate work stress and he opined that she could perform sedentary or light jobs. *Id.* at 301. He estimated that she would miss work less than once per month due to her impairment. *Id.*

Dr. Worst completed an agency physical RFC assessment on March 14, 2005 indicating that he first treated Plaintiff on April 11, 2003 and last treated her on February 11, 2005. Tr. at 303-307. He diagnosed Plaintiff with lumbar disc herniation and lumbar subluxation and indicated that Plaintiff had achieved maximum medical improvement. *Id.* at 303. He listed Plaintiff's primary symptoms as primarily right-sided low back pain, a left antalgic lean and a pinching in the low back with lower extremity radicular complaints. *Id.* He estimated Plaintiff's pain level at 6-10 on a ten-point scale and

indicated that medication had not relieved the pain. *Id.* He concluded that Plaintiff could sit for two hours out of an eight-hour day and she could stand/walk up to four hours. *Id.* at 304. He recommended that Plaintiff not be placed in a continuous sitting position in a work setting and he estimated that Plaintiff could lift and carry up to twenty pounds occasionally but she had significant limitations in repetitive reaching, handling, fingering or lifting. *Id.* He noted that Plaintiff had limited range of motion and tenderness in the lumbar spine, muscle spasms in her lumbar erector spinae, a left antalgic lean, and sensory loss that varied into her lower extremities. *Id.* at 305. The other limitations that he placed on Plaintiff's abilities included no stooping, bending or pulling. *Id.* The doctor further indicated that Plaintiff's emotional factors did not contribute to the severity of her symptoms and limitations and she was not a malingerer. *Id.* at 306. Dr. Worst indicated that Plaintiff was capable of a high degree of work stress with regard to handling emotional or mental stress as opposed to physical stress. *Id.* He further concluded that Plaintiff's impairments would cause her to be absent from work more than three times per month. *Id.*

On April 18, 2005, Dr. Cecil submitted a letter indicating that he had reviewed Plaintiff's June 22, 2004 MRI and he recommended additional testing including a percutaneous provocative discography with post discogram CT scan if Plaintiff's pain was intractable and incompatible with her daily living activities. Tr. at 308. Dr. Cecil stated that prior to any possible surgery, Plaintiff would have to participate in pre-operative detoxification of the substantial doses of opioid analgesics that she was taking for pain and she would have to stop smoking. *Id.*

On May 25, 2005, Dr. Quinn, a psychologist, performed a consultative psychological examination of Plaintiff. Tr. at 311-316. Plaintiff identified her medications as Zoloft, Diazepam, Doc-Q-Lace, Warfarin, Promethazine, Hydroco/Apap, Flovent, Mederidine and Pronentil and reported

-11-

that they made her sleepy. *Id.* at 311. She stated that she was unable to work due to health and emotional problems, including depression and frequent panic attacks. *Id*. She indicated that her life was out of control because of her health and relationships and she rated her conditions as interfering with her life on a scale of 8 out of 10. *Id.*

Dr. Quinn described Plaintiff as motivated and cooperative during the interview and found her behavior as not showing signs of exaggeration or minimization of symptoms. Tr. at 313. He found Plaintiff's speech normal and relevant, and her affect was within normal limits. *Id*. He observed that Plaintiff's body language was not within normal limits as she crossed her arms, made no eye contact, had a tearful facial expression, and did not face him. *Id.* Dr. Quinn described Plaintiff's depression as severe, but concluded that Plaintiff's cognitive functioning, immediate, short-term and long-term memory and her attention and concentration were within normal limits. *Id*. at 314. He diagnosed her with recurrent severe major depressive disorder without psychotic features and personality disorder not otherwise specified (obsessive-compulsive traits). Tr. at 315. He assigned her a GAF of 45 and described this functioning as marked. *Id*. As to work-related mental abilities, Dr. Quinn opined that Plaintiff was: "moderately or marked to a limited degree" in the ability to relate to others; minimally limited in understanding, remembering and following instructions; moderately limited in maintaining concentration, persistence and pace to perform simple, repetitive tasks, and "moderately or marked to a limited degree" in her ability to withstand the pressures and stress of everyday work. *Id*.

Dr. Withnell's notes show that Plaintiff presented numerous times for complaints of low back pain throughout 2005 and 2006. Tr. at 323-330. In February 2005, Plaintiff complained of increasing back pain with spasms. *Id*. at 338. Plaintiff was very tense on the right lumbosacral spine area with moderate tenderness over her left sacroiliac joint on the left side. *Id*. Dr. Withnell diagnosed

exacerbation of chronic low back pain and gave her Demerol.  *Id*.  In Spring 2005, Dr. Withnell saw Plaintiff for her recurrent back pain and noted that she was taking Valium, Zoloft, Phenergan, Vicodin and Demerol.  *Id.* at 334.

On October 13, 2005, Plaintiff presented to the emergency room for her back pain.  Tr. at 365.  She had taken a basket of wet clothes out of her car and felt discomfort that worsened over the day.  *Id.*  Plaintiff had tenderness over the spinous process, and intact pulses, sensation, and reflexes of the patella.  *Id.*  Plaintiff was given a prescription of Norflex and told to alternate ice and heat.  *Id.*

On October 14, 2005, Plaintiff followed up with Dr. Withnell from her emergency room visit.  *Id.* at 330.  He diagnosed her with back sprain/back strain and neck sprain/strain on the left and gave Tylenol #4 as needed with encouragement to take Vicodin alternatively and warm compresses.  *Id.*

On December 29, 2005, Plaintiff presented to the emergency room due to her back pain.  Tr. at 364.  She was given Morphine and Phenergan and discharged with Percocet and Medrol for a diagnosis of back pain exacerbation.  *Id*.

Plaintiff followed up again with Dr. Withnell's office on December 29, 2005 after the emergency room visit. Tr. at 327.  She stated that she was giving her St. Bernard a bath two days prior and woke up the next morning with severe back pain.  *Id*.  She took Vicodin with no relief and then went to the hospital, where she was given morphine and prescriptions for Percocet and Medrol Dosepak, which she did not fill.  *Id*.  She also complained of right thigh numbness and left thigh pain.  *Id*.  Plaintiff had tenderness over her L5-S1 area and she was diagnosed with lumbosacral strain.  *Id.*  She was prescribed Vicodin and Norflex, along with Relafen, and was told not to fill her hospital prescription for Medrol.  *Id*.  However, it was noted that Plaintiff had requested both the Medrol and Percocet prescriptions from the emergency room.  *Id.*

Dr. Withnell's notes also showed that Plaintiff complained of depression and thoughts of suicide after moving out of her boyfriend's home.  Tr. at 329.  Plaintiff was diagnosed with chronic

depression and anxiety with possible additional borderline personality disorder.  *Id.*  Dr. Withnell increased Plaintiff's Zoloft and continued the Valium for her anxiety and chronic back pain.  *Id.*

On January 7, 2006, Plaintiff presented to Dr. Withnell for low back pain.  Tr. at 326.  Dr. Withnell noted that Plaintiff's intermittent chronic low back pain over the last two to three years had at times been incapacitating and had required a hospital bed, muscle relaxers and narcotics.  *Id.*  He noted that Plaintiff's June 2004 MRI showed a central disc herniation with a tear of the L4-5 and mild disc bulge at L5-S1.  *Id.*  Dr. Withnell diagnosed chronic low back pain, continued her pain medications, and referred her to a pain management unit.  *Id.*

On January 25, 2006, Dr. Withnell completed a physical RFC questionnaire indicating that he first treated Plaintiff in 2002 and most recently treated her in December 2005.  Tr. at 318.  He diagnosed Plaintiff with chronic low back pain due to a L4-5 disc herniation and listed her prognosis as fair.  *Id.*  Dr. Withnell identified Plaintiff's symptoms as fluctuating low back pain that caused occasional incapacitation.  *Id.*  He concluded that Plaintiff could sit and stand/walk up to two hours per day, but cautioned that this "depended on other factors."  *Id.* at 319.  He recommended that Plaintiff not be placed in a job where she had to continuously sit, and he opined that she could frequently lift and carry up to five pounds and could occasionally lift and carry up to twenty pounds.  *Id.*  He also stated that Plaintiff had significant limitations in repetitive reaching if her low back was involved.  *Id.*  Dr. Withnell identified positive clinical findings supporting his diagnosis as limited range of motion in the lumbosacral spine, as well as tenderness, muscle spasms and trigger points.  *Id.*  He concluded that Plaintiff could not sustain employment in a job that required her to keep her neck in a constant position.  *Id.*  He further noted that Plaintiff could not stoop, push, pull or bend and she had psychological limitations due to depression.  *Id.*  He stated that Plaintiff was not a malingerer and she was capable of low stress work.  *Id.* at 321.  He opined that Plaintiff would be likely to miss work more than three times per month due to her impairments.  *Id.*

February 2006 notes show that Plaintiff presented to Dr. Withnell asking him to switch her pain medication from Percocet to Vicodin because she was going to work as a rehabilitation assistant at a hospital.  Tr. at 324.  Plaintiff told the doctor that her physical for the job did not go well, but the hospital was giving her an opportunity by monitoring her and having her demonstrate the skills for the job.  *Id*.  Plaintiff expressed tearful anxiety that things were not going to go well during this assessment and Dr. Withnell stated, "I agree with her history of chronic low back pain and her current state today, I think it is not going to go well."  *Id*.  He noted that Plaintiff had been to see an orthopedic surgeon and had declined surgery because she was afraid.  *Id.*  Upon examination, Plaintiff's back had point tenderness at the sacroiliac joints, she had a positive straight leg raise on the right and intact sensation.  *Id*.  Dr. Withnell diagnosed chronic low back pain secondary to herniated disc with suspected radiculopathy.  *Id*.  He switched her medication to Vicodin four times per day and referred her back to orthopedics for re-evaluation.  *Id.*  Plaintiff stated that she was more willing to undergo surgery at this time.  *Id*.

Plaintiff presented to the emergency room on March 12, 2006 due to worsening back pain. Tr. at 362.  The attending physician indicated that he knew Plaintiff well as he had seen her several times due to her back pain and radiculopathy.  *Id*.  He ordered a MRI and gave her pain medications for her exacerbated back pain with radiculopathy.  *Id.*

A MRI of Plaintiff's lumbar spine on March 14, 2006 showed a large right L5-S1 disc herniation compressing and displacing the S1 nerve root on the right.  Tr. at 350.

Dr. Cochran, an orthopedic surgeon, evaluated Plaintiff on March 31, 2006 for her right lower extremity pain and low back pain.  Tr. at 348.  He noted that Plaintiff had been to the emergency room four times in the past month due to flare-ups of her back pain and she reported difficulty performing daily activities.  *Id.*  Dr. Cochran noted the results of the March 14, 2006 MRI as showing decreased signal intensity at L4-5 and L5-S1 and a large herniated pulposus at L5-S1 on the right with a mild

midline bulge at L4-5.  *Id.* He diagnosed right sciatica secondary to herniated nucleus pulposus at L5-S1 and lumbar degenerative disc disease with chronic low back pain.  *Id*.  Dr. Cochran informed Plaintiff of her options of continuing nonsurgical treatment through medication and injections to treat the sciatica, but explained that her chronic back pain would likely continue.  *Id*.  He also explained her surgical option and scheduled her for surgery to relieve the back pain.  *Id.*

On April 2, 2006, Plaintiff presented to the emergency room due to back pain.  Tr. at 359.  She indicated that she had taken Valium, Vicodin and Norflex for relief, but they did not work.  *Id.*  The doctor offered to admit Plaintiff to the hospital, but she refused.  *Id.*  She was given Morphine and Phenergan and told that if her condition worsened, she should return to be admitted.  *Id.*

On April 18, 2006, Plaintiff underwent a microdiscectomy at L5-S1 for herniated nucleus pulposus of the L5-S1 right with intractable right sciatica.  Tr. at 346.  An x-ray of the lumbosacral spine showed mild L4-5 and L5-S1 interspace narrowing.  *Id*.

Dr. Withnell saw Plainitff on April 21, 2006, three days after low back surgery, and he noted that Dr. Cochran was managing her pain medications for the next six weeks.  Tr. at 323.

On May 6, 2006, a post-surgery MRI of the lumbar spine showed that Plaintiff was status post right laminectomy and had L5-S1 disc desiccation without significant disc space narrowing.  Tr. at 344.  She also had a disc bulge at L5-S1 resulting in mild flattening of the thecal sac.  *Id.*  At L4-5, she had disc desiccation with mild space narrowing and a bulge associated with annular tear and flattening of the thecal sac.  *Id.*

On May 7, 2006, Plaintiff presented to the emergency room due to back pain.  Tr. at 352.  Plaintiff had a MRI the day prior which showed fluid collection and the emergency room doctor attributed this fluid to seroma.  *Id.*  The doctor gave Plaintiff a shot and a Percocet home pack and told her to follow up with Dr. Cochran.  *Id.*

On May 9, 2006, Plaintiff presented to Dr. Withnell after Dr. Cochran's office called him and suggested that she needed sleep medication and treatment for bipolar disorder. Tr. at 393. Dr. Withnell noted that Plaintiff was still under the care of Dr. Cochran for post-operative pain management. *Id.* He indicated that Plaintiff admitted to mood swings which had been long-standing. *Id*. He also indicated that he had tried numerous medications in the past and none of them seemed to help. *Id*. He encouraged Plaintiff to see a psychiatrist, but she seemed resistant. *Id*. Dr. Withnell diagnosed chronic low back pain status post recent surgery and psychiatric issues including probable bipolar disorder. *Id.* He started Plaintiff on Lithium and stated "I do think that due to the long-standing nature of her chronic low back pain as well as her psychiatric issues at this point she probably does qualify in my opinion for disability." *Id*.

On June 6, 2006, Dr. Withnell indicated on a prescription pad that Plaintiff had diagnoses of bipolar disorder, borderline personality disorder, and chronic low back pain. Tr. at 391. He also stated "unable to work" on the prescription. *Id.* Dr. Withnell's notes from June 28, 2006 indicate that Plaintiff came for follow-up and still complained of some intermittent pain in the left lower extremity down to the knee. *Id*. at 392. She said that it was much less intense than the pain she experienced preoperatively. *Id*. Dr. Withnell also discussed Plaintiff's psychiatric health with her and he noted that she had a somewhat nebulous psychiatric problem to be either depression, bipolar disorder or borderline personality disorder. *Id*. He suggested that Plaintiff see a psychiatrist. *Id*.

### III.    SUMMARY OF TESTIMONIAL EVIDENCE

At the hearing before the ALJ on August 17, 2006, Plaintiff's attorney appeared, but Plaintiff did not. Tr. at 415. A prior hearing had been postponed because Plaintiff was hospitalized with back surgery and additional medical records were required for the record. *Id.* The ALJ indicated on the record that Plaintiff had called her attorney as well as the ALJ's staff and explained that she could not attend the hearing because she could not afford the price of gas and she was concerned that she could

not tolerate the trip of sixty miles to the hearing and sixty miles back home. *Id.* at 416. The ALJ found that Plaintiff had waived the right to be present for the hearing. The ALJ further stated:

> The reason we investigated that is because I do not - - I have never declared a Claimant as a non-essential witness in any of my cases except in overpayment or in cases that are technical cases where only the representative is allowed. However, since we'd already planned to have a medical expert and vocational expert here, we're going to go ahead. However, I'm still not finding that the Claimant is a non-essential witness.

*Id.* The ALJ then proceeded with the hearing and took testimony from the medical and vocational experts. *Id.*

The ALJ noted that Plaintiff was thirty years old and was twenty-eight years old at the time of her March 2, 2004 onset date. Tr. at 421. The ALJ also indicated that Plaintiff has a high school education and less than one year of college. *Id.* The ALJ discussed Plaintiff's work history with her counsel and indicated that questions existed as to what Plaintiff's duties were in her 1993 employment at Carol's Corporation and at Mullinax Ford in 1994. *Id.* at 421. When Plaintiff's counsel responded that he did not know her duties at these past jobs, the ALJ commented, "See, I don't know why people don't show up for their hearings, you know." *Id.* at 422. Plaintiff's counsel then responded, "Judge, I strongly advised her to attend today. So I - - because I know there's these issues." *Id.* The ALJ also indicated that she did not have a list of Plaintiff's current medications. *Id*. at 426.

Plaintiff's counsel indicated that Plaintiff's severe impairments of low back pain/herniated disc and psychological impairments prevented her from working. Tr. at 426. The ALJ then stated, "Counsel, since we don't have the claimant here, there's no testimony you can give about limitations." *Id*. at 428. The ALJ then took testimony from the medical expert, Dr. Richard Katzman. *Id*. at 429.

Dr. Katzman testified that Plaintiff's lumbar radiculopathy was supported by medical evidence showing a L4-5 and/or L5-S1 herniated disc with a tear, but no evidence of nerve root impingement until earlier in 2006. Tr. at 431. He indicated that the onset date of the radiculopathy from L5-S1 did

not become a major problem until February of 2006 and thus, he believed that it did not exist for one year. *Id*. at 432. Accordingly, he found that Plaintiff's disc degeneration and herniations did not meet any of the Listings individually or in combination until February 2006. *Id*. at 435. Based upon a lack of sufficient objective data since the nerve root impingement, Dr. Katzman could not determine whether Plaintiff's impairment met the Listings for January or February 2007. *Id.*

Dr. Katzman further testified that Plaintiff had a history of personality disorder, described in varying terms as moderate chronic depression, severe depression, borderline personality, bipolar disorder. Tr. at 431. He also pointed out what he believed to be drug-seeking behavior by Plaintiff, noting the April 18, 2005 report of a concern of substantial dose of opioids that Plaintiff was taking and the fact that she was receiving narcotics from two different doctors at the same time. *Id.* Dr. Katzman reported that although the medical records showed that Plaintiff has serious maladaptive problems and her psychiatric problems had existed for a long time, they did not meet the A, B, or C criteria under Listing 12.08 for personality disorders. *Id.* at 432.

When asked about Plaintiff's RFC, Dr. Katzman concluded that the record demonstrated that Plaintiff could perform sedentary work on a sustained basis. Tr. at 438. Upon learning that Plaintiff strained her back further due to bathing two large dogs, he further stated that she was capable of performing at least a limited light range of work. *Id.* Dr. Katzman indicated that the evidence did not show that Plaintiff needed a sit/stand option. *Id.* at 443. He further stated that while Plaintiff appeared from the medical records to have a chaotic or borderline personality, she would have no significant impairment interacting with the public or co-workers provided that she had a structured job with guidance on how to handle people. *Id.* He further testified that Plaintiff would not have difficulty remembering and executing simple instructions, so long as structure was provided. *Id.* at 444.

Upon questioning from Plaintiff's attorney, Dr. Katzman indicated that he was not a psychiatrist so he was unsure as to whether a dosage of Zoloft of 100 milligrams was significant. Tr. at 445. He further explained that the GAF of 45 is not supposed to take into account physical problems. *Id.* at 447. Dr. Katzman admitted that Plaintiff did have psychological limitations, but he cited the inability of medical professionals to diagnose her and her behavior of not going to therapy consistently among reasons for finding that her psychological impairments were not disabling. *Id.*

Plaintiff's attorney then asked Dr. Katzman about the radicular complaints and he concluded that while Plaintiff had complained all along of radiculopathy, the complaints became worse since February 1, 2006, when nerve root impingement was medically confirmed. Tr. at 448-449.

Vocational expert Mark Anderson took the stand and reviewed Plaintiff's past relevant work. Tr. at 451-454. He classified Plaintiff's past work as follows: switchboard operator which was sedentary, semi-skilled work; collection clerk which was sedentary and skilled work; patient registration representative which was sedentary to light work; cashier which was light and unskilled work; waitress which was light, semi-skilled work; and secretary which was sedentary or light, unskilled work. *Id.*

The ALJ asked Mr. Anderson whether a hypothetical person could perform Plaintiff's past relevant work with Plaintiff's background and the limitations of: lifting ten pounds frequently and twenty pounds occasionally; sitting, and standing/walking no more than six hours of an eight-hour day with normal breaks of every two hours; avoidance of unprotected heights, hazards and wet, slippery and uneven surfaces; and no climbing ladders, scaffolds, or ropes. *Id.* at 454-455. Mr. Anderson concluded that such a hypothetical person could perform all of Plaintiff's past jobs. *Id.* at 455.

The ALJ presented a second hypothetical person with the same limitations as the first and additional limitations of the ability to understand, remember and carry out only simple instructions

and work that involved routine or repetitive tasks, occasional face-to-face public interaction, and occasional interaction with co-workers and supervisors. Tr. at 455-456. Mr. Anderson responded that the person could still perform Plaintiff's past relevant work as a switchboard operator. *Id.* at 456.

Plaintiff's attorney asked Mr. Anderson the number of days that employers typically allow employees to miss work due to any reason. Tr. at 457. Mr. Anderson responded that employers of unskilled or semi-skilled work generally allow up to three days of missed work per month. *Id.* Plaintiff's attorney also asked whether a hypothetical person who could sit for only two hours per day and stand for two hours per workday could perform full-time employment. *Id.* Mr. Anderson concluded that such a person could not work full-time. *Id.*

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).    Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.     APPLICABLE LAW AND ANALYSIS

### A.      DURATION REQUIREMENT

Plaintiff challenges the third step in the sequential steps for evaluating entitlement to social security benefits.  She asserts only that the ALJ lacked substantial evidence to find that her condition did not equal Listing 1.04A from the date of January 2006 forward.  ECF Dkt. #11 at 9-10.  Plaintiff

states that the ALJ's reasoning for this finding was flawed because she only addressed whether Plaintiff's impairments existed for twelve months and did not discuss whether her impairments could reasonably be expected to last for a continuous period of at least twelve months. *Id.* at 10. She contends that the ALJ never rendered a conclusion on this issue, which was critical because the ALJ found that she had met the Listing from January 2006 through the date of the decision, which was September 21, 2006. *Id.* She states that the record lacks any evidence to suggest that her condition would not last for four more months in order to meet the twelve-month requirement and the medical expert simply stated that he was not sure whether she would still meet the Listing by January or February 2007. *Id.* at 11.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 404.1525(a). To meet a listed impairment, the claimant must show that her impairment meets all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). 20 C.F.R. §§ 404.1525(d) and 416.925(d). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). In order to meet a listed impairment, the claimant must also show that her condition is "either permanent, is expected to result in death, or is expected to last at least 12 months, as well as to show that [her] condition meets or equals one of the listed impairments. Where a claimant successfully carries this burden, the Secretary will find the claimant disabled without considering the claimant's age, education, and work experience." *Listenbee v. Sec'y of Health and Human Servs.,* 846 F.2d 345, 350 (6th Cir. 1988), citing 20 C.F.R. § 404.1520(d).

The Court finds that the ALJ's failure to address whether her impairments could reasonably be expected to last for a continuous period of at least twelve months was not erroneous because Plaintiff failed to meet her burden of production with regard to the durational requirement. However,

-23-

the record does not contain any evidence establishing that Plaintiff's impairment could be expected

to last the additional four months.  This lack of evidence does not fall upon the ALJ, but upon Plaintiff

because it is her burden at Step Three to establish that her conditions meet Listing 1.04A, which

includes showing that the conditions could be expected to continue at least twelve months.  Plaintiff

did not meet this burden.  Accordingly, the Court finds that the ALJ's alleged failure to address this

issue was not error.

### B.        PLAINTIFF'S ABSENCE FROM THE HEARING

Plaintiff also asserts that the ALJ abused her discretion by improperly proceeding with the

hearing in Plaintiff's absence and denying her a full and fair hearing.  ECF Dkt. #11 at 13.  Plaintiff

contends that the ALJ violated Section 1-2-425(D) of the Social Security Administration's Hearings,

Appeals, and Litigation Law Manual ("HALLEX").  *Id*. at 12.

HALLEX § 1-2-425(D) is entitled "Claimant's Representative Appears at Hearing Without

the Claimant" and provides in relevant part:

> If a claimant's representative appears at a scheduled hearing without the claimant, the ALJ must determine whether the claimant is an essential witness for a proper determination of the case.
>
> 1. If the claimant is not considered to be an essential witness, the ALJ should proceed with the hearing and issue the decision.
>
> 2. If an ALJ determines that claimant is an essential witness, the ALJ should offer to postpone the hearing so that the claimant may appear.
>
> ....
>
> NOTE: If a representative appears at a scheduled hearing without the claimant, dismissal is not appropriate even if the ALJ has determined that the claimant is an essential witness.

Due process principles apply to Social Security proceedings.  *Suciu v. Barnhart*, 405

F.Supp.2d 874, 880 (M.D. Tenn. 2005).  Due process requires that the claimant receive

meaningful notice and the opportunity to be heard before the ALJ or the agency can deny a claim

for disability benefits.  *Stoner v. Sec'y of Health and Human Servs*., 837 F.2d 759, 760-61 (6th Cir.

1988).  The social security regulations provide that any party to a hearing has a right to appear before an ALJ, either personally or through a designated representative, and has a right to present evidence and to state her position.  20 C.F.R. § 416.1450(a).  A claimant can waive her right to appear, however. 20 C.F.R. § 416.1450(b).  Pursuant to Social Security Ruling ("SSR") 79-19, a valid waiver of a right to appear at a hearing is made when a claimant signs a statement to that effect.  "In that statement, a claimant should acknowledge that he or she has been informed of the nature of the proceeding and his or her right to counsel, to appear and to testify at the hearing, to present evidence, to waive the right to appear, and to have the waiver withdrawn prior to the mailing of the ALJ's decision."  *Stoner,* 837 F.2d at 761.

The Court notes that:

> it is unclear whether the provisions contained in the HALLEX are legally binding and enforceable on their own in the Sixth Circuit. However, the Sixth Circuit has given effect to the guidelines contained therein. *See Kirves v. Callahan,* 113 F.3d 1235 (6th Cir.1997) (unpublished). In one decision, the Sixth Circuit found the HALLEX to provide due process. *See Adams v. Massanari,* 55 Fed.Appx. 279, 283-87, 2003 WL 173011 at *4-8 (6th Cir. Jan.23, 2003).

*Suciu*, 405 F.Supp.2d at 880.

While SSR 79-19 was not followed exactly in this case, Plaintiff received notice of the hearing, as evidenced by the Acknowledgment of Receipt (Notice of Hearing) form that she returned to the agency.  Tr. at 84.  The form indicated the date, time and location of the hearing and Plaintiff checked the box indicating that she would not be attending.  *Id.*  Further, Plaintiff wrote on the line below the line that she checked that "I authorize Jared Cook to proceed with my hearing on my behalf due to the fact that I am unable to attend."  *Id.*  She signed the form and dated it.  *Id.*  The form also informed Plaintiff that the time or place of the hearing would be changed if she provided a good reason for such a request.  *Id.*  Plaintiff did not request a change in the time or the location of the hearing.  *Id.*  Plaintiff also handwrote a letter to the agency dated August 11, 2006 stating: "Jared Cook is able and will be authorized to proceed at my hearing on

Aug 17th 2006, on my behalf.  I will not be able to attend this hearing." *Id*. at 83.  Plaintiff signed the letter and dated it. *Id.*  Further, the ALJ indicated on the record at the hearing that Plaintiff explained to agency staff and her attorney that she could not afford to drive to the hearing due to the price of gas and because she was not sure that she could physically make the trip. *Id*. at 415-416.  Again, however, Plaintiff did not request a change in the time or the location of the hearing so that she could attend.

These facts support a finding that Plaintiff waived her right to be present at the hearing. Here, offering to postpone the hearing or postponing the hearing would not have resulted in a different outcome.  Plaintiff had indicated that she would not be attending the hearing and she authorized her attorney to proceed in her absence.  Tr. at 84.  When given the opportunity to do so on the Acknowledgment form, Plaintiff did not request a rescheduling of the hearing or a change in its location of the hearing. *Id*. at 84.  She simply indicated that she would not be attending and that her attorney was authorized to proceed in her absence.  Insofar as Plaintiff argues that the ALJ should have given her the opportunity to appear for the hearing telephonically, neither she nor her counsel made such a request of the ALJ.

Further, the ALJ did not err in proceeding with the hearing in this case based upon the HALLEX provision cited by Plaintiff.  First, even if the HALLEX provisions are binding in this Circuit and District, HALLEX § 1-2-425(D) does not contain mandatory language obligating the ALJ to proceed with the hearing or to offer to postpone it.  Here, the ALJ carefully indicated on the record that she was not deeming Plaintiff a "non-essential"witness, explaining that she considered Plaintiff's reasons for not attending and decided to proceed with the hearing in Plaintiff's absence, but with her counsel present.  Tr. at 23.  While it is true that the ALJ did not deem Plaintiff an essential or non-essential witness, HALLEX 1-2-425(D) states what an ALJ *should* do after making such a determination; the ALJ *should* either proceed with the hearing and issue a decision in the claimant's absence if Plaintiff is deemed a non-essential witness, or the ALJ

*should* offer to postpone the hearing if the claimant is deemed an essential witness.  Nothing in this section of HALLEX requires the ALJ to offer to postpone the hearing.

For these reasons, the Court finds that the ALJ did not err in proceeding with the hearing in Plaintiff's absence as Plaintiff validly waived the right to appear.

### C.     WEIGHT ATTRIBUTED TO PHYSICIANS' OPINIONS

#### 1.     DR. WITHNELL

Plaintiff also asserts that the ALJ improperly discredited the opinions of Dr. Withnell, her treating doctor and two state agency doctors, Dr. Dunn and Dr. Quinn.  ECF Dkt. #11 at 13-18.  As to Dr. Withnell's opinions, Plaintiff points out that while most of his conclusions of disability were made after January 2006, he did state on July 16, 2004 that she was "temporarily, permanently disabled" and he found in his January 25, 2006 assessment that her symptoms and limitations persisted since 2003 and that she could sit for only two hours and stand/walk for two hours of an eight-hour workday.  *Id.*, citing Tr. at 191, 321.  Plaintiff also cites to Dr. Withnell's post-January 2006 conclusions, including his May 9, 2006 note that she "probably" qualified for disability, his June 6, 2006 notation that she was unable to work, and his January 25, 2006 assessment that she could only sit for two hours and stand/walk for two hours of an eight-hour workday.  ECF Dkt. #11 at 17, citing Tr. at 319, 391, 393.  Plaintiff contends that the ALJ failed to properly explain her rationale for rejecting these opinions and failed to explain why she found that Dr. Withnell's progress notes did not support his conclusions.  *Id.* at 18.

An opinion on the nature and severity of a claimant's impairment is entitled to controlling weight when: (1) the source giving the opinion is a "treating source" as defined in the regulations; (2) the opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques; and (3) the opinion is not inconsistent with other evidence.  20 C.F.R. §404.1527 (d)(2); *McKenzie v. Comm'r., Soc. Sec. Admin.*, 215 F.3d 1327(Table), 2000 WL 687680, *3 (6th Cir. May 19, 2000), unpublished.  A treating physician's opinion is also to be afforded more

weight than a physician employed by the government. *Houston v. Sec'y of Health and Human Servs.,* 736 F.2d 365, 367 (6th Cir. 1984).  However, that opinion must be based on clinical and test evidence and must be consistent with the other evidence. *Bogle v. Sullivan,* 998 F.2d 342, 347-348 (6th Cir. 1993); *Varley v. Secretary of Health and Human Servs.,* 820 F.2d 777, 779-780 (6th Cir. 1987); *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980);.  An ALJ is not bound by a treating physician's opinions, but must articulate the reasons for rejecting these opinions in his decision. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).  In other words, an ALJ is not bound by the opinion of a treating physician where substantial evidence exists to the contrary. *Hardaway v. Sec'y,* 823 F.2d 922, 927 (6th Cir.1987).

The Court finds that the ALJ adequately articulated her reasons for discrediting Dr. Withnell's disability findings and substantial evidence supports those reasons. Contrary to Plaintiff's assertion, the ALJ did explain why she was giving little weight to Dr. Withnell's opinions:

> Although he is a treating physician who has an extensive history of examining Ms. Hilton, his opinions show what he believed her recent restrictions are but does not deal with what her residual functional capacity would [sic] for the period prior.  His progress notes establish Ms. Hilton's strength was 5/5 throughout the time Dr. Withnell treated her.  Although he occasionally found symptoms present on physical examinations, such symptoms varied and were intermittent.  The bulk of his progress notes do not contain information substantiating Ms. Hilton as limited as his opinions state.  Additionally, it is not clear he understood the meaning of "disabled" under the Regulations.  Dr. Katzman and I had access to evidence at the hearing level that Dr. Withnell never saw.

> While I do believe Ms. Hilton's back problem meet a listing as of early 2006, the evidence does not establish she is disabled prior to that.  By the date of this decision, her impairments have not been at listing level for 12 consecutive months.

> I assign substantial weight to Dr. Katzman's opinion, indicating that he had the opportunity to review the entire record, including evidence submitted at the hearing level.  As stated earlier, he felt Ms. Hilton was not disabled and could perform sedentary work prior to February 2006.  Dr. Katzman provided the basis for his opinion and it is consistent with the record as a whole.

*Id.* at 30.

The ALJ also discussed Dr. Withnell's progress notes and physical examination findings. Tr. at 28. She cited Dr. Withnell's June 3, 2004 progress notes finding that Plaintiff denied any neurologic symptoms of the lower extremities and he observed her having trouble getting onto the exam table, but having no difficulty walking out of the office. *Id*. The ALJ also reviewed the examination findings which indicated straight leg raising equivalence on the right and negative on the left, with 5/5 strength in the lower extremities. *Id*. The ALJ cited Dr. Withnell's progress note of August 3, 2004 which reported negative straight leg raising and only a "minimally" antalgic gate. *Id.* She further cited Dr. Withnell's notes indicating that Plaintiff had gotten a St. Bernard and was training him and she stated that working with the dog was making her back feel worse. *Id*. The ALJ also cited to Dr. Withnell's September 16, 2004 progress note indicating that Plaintiff was caring for her children and had gotten a German Shepard that was pulling at her. *Id*. She also noted his findings that Plaintiff was only in mild distress secondary to her back pain. *Id*. The ALJ also cited to Dr. Withnell's September 18, 2004 progress note finding that Plaintiff complained of no back pain at this visit and had only slight tenderness in the suprapubic region on deep palpation with 5/5 upper and lower extremity strength. *Id*.

In addition, as to all of Dr. Withnell's opinions of disability, the ALJ found that it was unclear whether Dr. Withnell understood the meaning of "disabled" for Social Security purposes when he made such conclusions. Tr. at 30. A physician's statement that a claimant is "disabled" or "unable to work" is not considered a medical opinion, but is an opinion on an issue that is reserved to the Commissioner and is not entitled to any special deference. 20 C.F.R. §§ 404-1527(e)(1); 416.927(e)(1). Moreover, in his January 25, 2006 assessment, Dr. Withnell indicated that Plaintiff could sit for only two hours and stand/walk for two hours, but he noted that these conclusions "depend[ed] on other factors", but he failed to explain what these other factors were. *Id.* at 319. He also indicated that emotional factors additionally contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* at 321. Thus, it is unclear as to the extent of

Plaintiff's back impairment on Dr. Withnell's January 25, 2006 findings.  And Dr. Withnell's May 9, 2006 progress notes that Plaintiff is "probably" disabled due to the "long-standing nature of her chronic low back pain as well as her psychiatric issues".  Tr. at 393.  Dr. Withnell does not definitively state that Plaintiff is disabled and gives no indication that he meant "disabled" for Social Security purposes.  In addition, the June 6, 2006 notation that Plaintiff was "unable to work" was written on a prescription pad and merely stated that Plaintiff had diagnoses of bipolar disorder, borderline personality disorder and chronic low back pain and she was "unable to work." Tr. at 391.  No further explanation or support was given for this finding.

Moreover, substantial evidence supports the ALJ's finding that the bulk of Dr. Withnell's progress notes prior to January 2006 did not support a finding that Plaintiff's limitations relating to her back impairment were as severe and restricted as he found.  For instance, Dr. Withnell described Plaintiff on numerous occasions as in only "mild to moderate distress", and with mostly only "mild distress" noted secondary to her back pain.  Tr. at 184, 188, 190, 195.  On June 29, 2004, Dr. Withnell even noted that Plaintiff was in no acute distress and she was "much more comfortable" at this visit than the prior visit.  *Id.* at 194.  He also noted that while Plaintiff's back was a little tight, it was not tense or tender as it was on the last exam.  *Id.*  He also found that Plaintiff had a better range of motion and a normal gait, although he did refer her to an orthopedic surgeon.  *Id.*  On July 16, 2004, Dr. Withnell again indicated that Plaintiff was in no acute distress. *Id.* at 191.  On August 3, 2004, Dr. Withnell noted that Plaintiff had less tenderness over her right lumbosacral paraspinal musculature.  *Id.* at 188.

For these reasons, the Court finds that the ALJ adequately articulated her reasons for rejecting Dr. Withnell's opinions on disability and extreme limitations and substantial evidence supports the ALJ's decision to give little weight to the findings and opinions of Dr. Withnell.

### 2. **DR. DUNN**

Plaintiff complains that the ALJ improperly rejected the findings of Dr. Dunn, a consulting

agency physician, who found in particular that Plaintiff would have a "likely moderate-marked" limitation in withstanding the stress and pressures of daily work.  ECF Dkt. #11 at 14; Tr. at 159. He also assigned Plaintiff a GAF of 49, which indicated serious symptoms.  Tr. at 159.  Plaintiff asserts that the ALJ's reasons for rejecting this opinion were insufficient because she did not mention the GAF and relied upon the fact that Plaintiff could perform some daily activities, which does not necessarily mean that she was capable of handling daily work stressors in a competitive job setting or in an appropriate manner.  *Id.*

The ALJ found that Dr. Dunn's "moderate-marked limitation" in Plaintiff's ability to withstand the stress and pressures of daily work was inconsistent with the weight of the evidence and unsupported in the record.  Tr. at 29.  She found that this limitation was based upon Plaintiff's self-report that she had difficulty taking care of her children, which was inconsistent with the record that showed that she was consistently able to care for her children, perform all daily household chores, and even train and care for pets.  *Id.*  As to the opinions of both Dr. Dunn and Dr. Quinn, the ALJ indicated that they were less reliable than the opinion of Dr. Katzman, the medical expert, because they did not have access to the evidence that was available to the ALJ and Dr. Katzman at the hearing.  *Id*. at 29.

The weight that an ALJ gives to each medical opinion depends upon the relationship that exists between the medical source and the claimant. 20 C.F.R. §§ 404.1527(d) and (f), 416.927(d) and (f). The opinion of a treating physician or psychologist is usually given the greatest weight, the opinion of an examining physician or a psychologist is generally entitled to less weight than that of a treating physician or psychologist, and the opinion of a non-examining State agency physician or psychologist is generally entitled to the least weight of all. 20 C .F.R. §§ 404.1527(d)(1), (d)(2), and (f), 416.927(d)(1), (d)(2), and (f); Social Security Ruling 96-6p. While ALJs are not bound by the findings of state agency medical or psychological consultants, they must consider these findings as opinion evidence, except for the determination as to whether

-31-

a claimant is disabled.  20

C.F.R. § 404.1527(f)(2)(ii).

Further, the report of a consultative physician who examined a claimant only once is entitled to "no special degree of deference."  *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) and an ALJ may give greater weight to the opinions of a reviewing physician over a consulting physician where the ALJ considered both opinions and the reviewing physician explained his position by referring to the objective medical evidence in the file and had access to the entire medical record.  *Barker*, 40 F.3d at 794-95.  A medical expert's testimony which is consistent with the evidence constitutes substantial evidence to support an ALJ's decision.  *Atterberry v. Sec'y of Health and Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989).

Here, Dr. Dunn examined Plaintiff only once.  Thus, the ALJ owed no special deference to his limitations.  Further, substantial evidence supports the little weight that the ALJ gave to the opinion of Dr. Dunn regarding Plaintiff's limitations because it was based upon Plaintiff's self-report which contradicts other evidence of record.  Contradictions about a claimant's ability to perform daily activities may support a conclusion that Plaintiff's allegations were not credible. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).  Although Plaintiff reported to Dr. Dunn that she had difficulty caring for her children, the record showed that she did care for her children and additionally took on caring for and training two large dogs.  In July 2004, Plaintiff told Dr. Withnell that she was caring for her children, although it was difficult because she felt like she could sleep all day due to depression.  Tr. at 249.  Dr. Withnell found that she was capable of performing low stress work. *Id.* at 321.  Further, the only time that Dr. Withnell noted that Plaintiff complained of stress was in September 2004 when Plaintiff told him that she was stressed because of her ex-fiancee and her back pain. *Id.* at 185.  Plaintiff also reported that she had gotten a St. Bernard that had been pulling at her and exacerbating her pain. *Id.* at 185.

In addition, Dr. Dunn's opinion is entitled to little deference because it does not elaborate on the degree of this limitation except to say that it is "likely moderate-marked." Tr. at 159. He fails to detail whether this limitation as more moderate than marked or more marked than moderate. Further, Dr. Dunn hedged his opinion with the term "likely", indicating an indiscernible level of doubt in his opinion.

Lastly, the fact that the ALJ did not mention the GAF of 49 that Dr. Dunn assigned to Plaintiff is not error. The Sixth Circuit has held:

> The [Global Assessment Functioning] score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.... [A] score may have little or no bearing on the subject's social and occupational functioning.... [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a[GAF] score in the first place. Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings....... Any failure to reference [GAF] scores or to compare different scores attributed to the same subject, without more, does not require reversal.

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x, 411, 415-16 (6th Cir.2006) (citations and quotations omitted).

For these reasons, the Court finds that substantial evidence supports the ALJ's determination to discredit Dr. Dunn's moderate-marked limitation as to Plaintiff's ability to withstand stress and pressures associated with daily work activity.

### 3.       DR. QUINN

Plaintiff also contends that the ALJ erred in rejecting the opinions of Dr. Quinn, a second consultative examiner. ECF Dkt. #11 at 16. She asserts that the ALJ improperly discredited the limitations of Dr. Quinn, who assigned Plaintiff a GAF of 45 and found that she was "moderately limited and limited to a marked degree" in relating to others and in withstanding the stress and pressures of daily work. ECF Dkt. #11 at 16; Tr. at 315. Plaintiff asserts that the ALJ made only

a "bare-bones" statement that Dr. Quinn merely accepted all of Plaintiff's subjective complaints relating to her ability to relate to others and the ALJ provided even less analysis as to Dr. Quinn's opinion that Plaintiff was moderately to markedly limited in withstanding daily work pressures and stresses. *Id.* Plaintiff further complains that while the ALJ stated that she and Dr. Katzman had more evidence available to them at the hearing than Drs. Quinn and Dunn, she did not identify the evidence to which she was referring. *Id.*

The ALJ gave little weight to Dr. Quinn's findings that Plaintiff was moderately to markedly limited in her abilities to relate to others and to withstand the stress and pressures of daily work. *Id.* at 29, 315. She explained that Dr. Quinn examined Plaintiff once and relied heavily on Plaintiff's subjective complaints in finding her "moderately to limited to a marked degree" in her ability to relate to others. *Id.*

Substantial evidence supports the ALJ's reasoning. Again, the opinion of a consulting physician who examined a claimant only once is entitled to no special deference. *Barker*, 40 F.3d 789, 795. In addition, Dr. Quinn indicated that his limitation on Plaintiff's ability to relate to others was based "on the history, friends during daily activities, and how the examinee related to me today." Tr. at 315. Thus, the ALJ correctly determined that Dr. Quinn mainly relied upon Plaintiff's self-reports.

Further, like Dr. Dunn, Dr. Quinn did not elaborate on the degree of his limitations except to state that Plaintiff was "moderately limited and limited to a marked degree" in relating to others and in withstanding the stress and pressures of daily work. Tr. at 315.

Moreover, the ALJ noted with regard to each of these agency physicians that she and Dr. Katzman had evidence available to them at the hearing that they did not have before them when issuing their opinions, which made their opinions less reliable. Tr. at 29. Substantial evidence supports this assertion as well, because the only information that Dr. Quinn referred to in his

report was the function report that Plaintiff had completed for the agency and the ALJ indicated that Dr. Katzman had the opportunity to review the entire record. *Id*. at 30, 311.

Lastly, as found above, the ALJ was not required to mention, refer to or discuss Dr. Quinn's GAF for Plaintiff. *DeBoard,* 211 F. App'x, at 415-16.

After reviewing the opinions of Drs. Dunn and Quinn and discrediting the limitations that they opined, the ALJ explained why she was assigning substantial weight to Dr. Katzman's opinion, indicating that he had the opportunity to review the entire record. Tr. at 30. Plaintiff does not challenge the testimony of Dr. Katzman or the ALJ's reliance upon his testimony, except to assert that neither the ALJ nor Dr. Katzman had the benefit of meeting Plaintiff or examining her. However, as explained above, the consulting opinions of those who examine a claimant only once are not entitled to any special degree of deference. Thus, the ALJ could reasonably rely upon Dr. Katzman's findings and opinions once she explained her rationale for rejecting the limitations of Drs. Dunn and Quinn.

**VII**. **CONCLUSION**

For the foregoing reasons, the Court affirms the ALJ's decision denying benefits to Plaintiff.

Dated: April 30, 2008             */s/George J. Limbert*
                            GEORGE J. LIMBERT
                            U.S. MAGISTRATE JUDGE